IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CAPITAL CITY JET CENTER, INC.<br>2000 Norton Road<br>Columbus, Ohio 43228,<br><br>  Plaintiff,<br><br>v.<br><br>STEVENS AEROSPACE AND DEFENSE SYSTEMS LLC<br>c/o CORPORATION SERVICE COMPANY<br>251 Little Falls Drive<br>Wilmington, DE 19808,<br><br>  Defendant. | CASE NO.<br><br>JUDGE<br><br>**COMPLAINT**<br><br>**(Jury Demand Endorsed Hereon)** |

  Plaintiff Capital City Jet Center ("Capital") states as follows in support of its claims against Defendant Stevens Aerospace and Defense Systems LLC ("Stevens"):

### I. Parties, Jurisdiction, and Venue

  1. Capital is an Ohio corporation headquartered in Columbus, Ohio. Capital provides full-service aviation and aircraft services and specializes in providing best-in-industry private air charter services. Capital operates out of its base at Bolton Field (TZR) in southwest Columbus.

  2. Upon information and belief, Stevens is a Delaware corporation with its principal place of business in Greenville, South Carolina. Stevens has a facility in Dayton, Ohio, from which Stevens offers aviation maintenance and repair services. Stevens claims that its Dayton facility "brings together one of the region's most experienced teams engaged in major and minor inspections; airframe and engine maintenance and repair; avionics repair and installations; full paint and interior refurbishments – for a variety of airframes, including Citation . . ."

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this matter involves citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of attorneys' fees, interest, and costs.

4. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Capital's claims occurred in this district.

## II. FACTS AND ALLEGATIONS

### A. Background

5. Capital operates three aircraft as part of its charter operations.

6. Capital relies on a well-maintained fleet of aircraft that are suitable to Capital's passengers' needs.

7. A failure to follow required maintenance schedules could result in safety issues for Capital's crews and passengers. But unplanned maintenance issues can also prevent Capital aircraft from operating, which results in significant lost profit for any day the aircraft is not in service.

8. Also, as a part 135 charter operator, Capital is required to meet all applicable Federal Aviation Administration ("FAA") maintenance requirements.

9. Capital meets its maintenance needs, in part, by following a maintenance schedule for each of its aircraft and engines. Capital's aircraft also sometimes require unplanned maintenance. Capital does not have a significant internal maintenance operation. Therefore, it relies on a variety of third-party maintenance facilities to perform most of the work Capital's fleet requires. One of these maintenance and repair facilities is Stevens.

### B. Capital takes the Aircraft to Stevens for routine maintenance.

10. One of the aircraft Capital owns is a Cessna Citation 525B, tail number N53NW, serial number 525B0053 (the "Aircraft"). The Aircraft is powered by two Williams FJ44 engines.

4856-3156-6919, v.1

11. On June 21, 2022, Capital took the Aircraft to Stevens' facility in Dayton for a wing spar splice plate inspection and other minor inspections. This maintenance was part of Cessna's recommended maintenance schedule, and Capital was therefore required to have the maintenance done to comply with FAA regulations. Stevens performed this work pursuant to a work order # B25511.

12. Stevens told Capital that the inspection and maintenance would be completed within ten days so that the Aircraft could be back in service for the busy Independence Day holiday.

13. As part of the wing spar splice plate inspection, Stevens incorrectly drilled out hi-locks on the wing spar splice plate. As a result, the manufacturer-specified hi-locks no longer fit. This incorrect drilling caused damage that prevented the Aircraft from operating safely.

14. Additionally, Stevens damaged the surface of the wing spar splice plate with a drill bit and performed unauthorized sanding, called "blending," that further damaged the Aircraft.

15. Stevens' own documents admit that Stevens caused this damage. For instance, in an invoice Stevens sent to Capital, Stevens stated: "During hi-loc removal for compliance of Document MP on RH wing, *the center spar at WS 127-131 was damaged*." (Emphasis added) (Invoice 6, a copy of which is attached as Exhibit A.)

16. Despite Stevens causing this damage to the wing splice plate, Stevens did not inform Capital of the damage. Instead, a third-party technician informed Capital of the damage.

17. Upon information and belief, Stevens did not intend to inform Capital of the damage to the wing splice plate and instead believed it could cover up the incorrect drilling and damage.

18. After Capital learned of the damage, its Director of Maintenance, Bobby Miley ("Miley"), traveled to Stevens' facility to inspect the Aircraft and the damage. After Miley

4856-3156-6919, v.1

inspected the damage, he arranged to have pictures of the Aircraft submitted to Textron Aviation Engineering ("Textron") to inspect the Aircraft and develop a repair plan for the damage that had been caused by Stevens. (Cessna is one of the brand names under which Textron sells aircraft.)

19. After inspecting the Aircraft, Textron mandated that the wing splice plate be replaced. Textron approved this work to be done as a field repair, so it was completed at Stevens' Dayton facility.

20. Because of the damage caused by Stevens, the Aircraft was unable to return to service until September 26, 2022, nearly three months later than Stevens had agreed.

21. Capital lost profit in excess of $6,000 per day while the Aircraft was unable to operate because of the damage Stevens caused.

22. Capital was also forced to pay an early engine overhaul fee to Williams in the amount of $28,344.58 because the Aircraft's engines were unable to be serviced under their regularly scheduled engine overhaul with Williams.

23. Finally, as a result of the repair done on the wing spar necessitated by Stevens' damage to the Aircraft, the Aircraft is less attractive to future buyers and has diminished in value.

**C.     Capital discovers additional damage to the Aircraft.**

24. After the Aircraft completed its maintenance and repairs at Stevens, Capital began noticing problems with the fuel tanks and fuel to oil heat exchanger on the Aircraft.

25. Capital took the Aircraft to its regular maintenance shop, Innotech-Execaire Aviation Group ("Execaire") to investigate the fuel issues after Capital was unsuccessful in remedying the problem on its own.

26. Execaire found substantial contamination in the fuel tanks, including fine metal shaving debris and sealant, which caused fuel flow issues. (Pictures of the contamination are

4

attached as Exhibit B.) Execaire attributed the debris and sealant to unapproved sanding work Stevens performed on the wing spar as part of its maintenance and attempted repair work.

27. Execaire performed additional maintenance on the Aircraft's fuel tanks and heat exchanger to allow the Aircraft to operate.

28. The fuel contamination issues caused by Stevens have resulted in additional down time for the Aircraft, maintenance expenses of approximately $76,410, and costs related to ferrying the Aircraft to and from Columbus for maintenance.

## COUNT I
## Breach of Contract

29. Capital restates the allegations set forth in the foregoing paragraphs as though fully set forth herein.

30. Capital and Stevens entered into a contract pursuant to which Stevens would perform inspection and maintenance services on the Aircraft.

31. Capital fully performed its obligations under the contract.

32. Stevens breached the contract by failing to properly perform its maintenance, inspection, and repair work, which resulted in damage to the Aircraft.

33. As a direct and proximate result of Stevens' breach of the contract, Capital has been damaged in an amount to be determined at trial.

## COUNT II
## Negligence

34. Capital restates the allegations set forth in the foregoing paragraphs as though fully set forth herein.

35. Stevens had a duty to Capital to act with the ordinary care owed to a user of Stevens' maintenance and repair services.

5

36. Stevens breached that duty to Capital by, among other things, damaging the wing spar splice plate as part of a routine inspection, introducing substantial contamination into the fuel tanks, and failing to properly communicate to Capital when Stevens had caused damage to the Aircraft.

37. As a direct and proximate result of Stevens' improper conduct, Capital has incurred direct, indirect, and consequential damages. Those damages include lost profits, increased maintenance costs, early engine overhaul costs, and attorney's fees in an amount to be determined at trial.

**WHEREFORE,** Capital respectfully requests the following relief against Stevens:

- Compensatory damages in an amount to be proven at trial, but which in any event exceeds $75,000, exclusive of interest and costs;

- Lost profits in an amount to be proven at trial, but which in any event exceeds $75,000, exclusive of interest and costs;

- The reasonable costs and attorneys' fees that Capital has incurred as a result of Stevens' conduct, including but not limited to the fees incurred in prosecuting this action;

- Pre-judgment and post-judgment interest at the maximum rates permitted by law; and

- Such other or further relief that this Court deems just and proper.

Respectfully submitted,

/s/ *Jerry A. Eichenberger*
Jerry A. Eichenberger    (0010855)
Jason J. Blake           (0087692)
John F. Fisher           (0085455)
Calfee, Halter & Griswold, LLP
Huntington Center
41 S. High Street, Suite 1200
Columbus, Ohio 43215
(614)621-7780 (Phone)
(614)621-0010 (Fax)
jblake@calfee.com
jeichenberger@calfee.com

6

jfisher@calfee.com

*Attorneys for Plaintiff*

4856-3156-6919, v.1